**In re METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION.**

No. 00 Civ. 1898(SAS).
MDL No. 1358.

United States District Court,
S.D. New York.

July 16, 2002.

Morris A. Ratner, Lieff, Cabraser, Heimann & Bernstein, LLP, New York City, Liaison Counsel.

Lewis J. Saul, Jon Hinck, Lewis Saul & Associates, P.C., Washington, D.C., Robert Gordon, Mitchell M. Breit, John M. Broaddus, Weitz & Luxenberg, P.C., New York City, A. Hoyt Rowell, Ness, Motley, Loadholt, Richardson & Poole, Mt. Pleasant, SC, for the Berisha Plaintiffs.

Morris A. Ratner, Elizabeth J. Cabraser, Lieff, Cabraser, Heimann & Bernstein, LLP, New York City, Joe R. Whatley, Jr., Whatley Drake, L.L.C., Birmingham, AL, Dennis C. Reich, Reich & Binstock, Houston, TX, Timothy Crowley, Crowley & Douglas, Houston, TX, A. Hoyt Rowell, T. Christopher Tuck. Ness, Motley, Loadholt, Richardson & Poole, Mt. Pleasant, SC, C. Anthony Graffeo, Cory, Watson, Crowder & Degaris, Birmingham, AL, Mitchell A. Toups, Weller, Green, McGown & Toups, Beaumont, TX, for the Young Plaintiffs.

Stephen M. Tillery, Steven A. Katz, Michael B. Marker, Carr, Korein, Tillery, et al., Belleville, IL, Scott Summy, Celeste Evangel, Cooper & Scully, PC, Dallas, TX, for the England Plaintiffs.

Kenneth F. McCallion, Goodkind, Labaton, Rudoof & Sucharow LLP, New York City, for the Berrian Plaintiffs.

Peter Sacripanti, McDermott, Will & Emery, New York City, for Liaison Counsel.

Robert H. Shulman, Mindy G. Davis, Brent H. Allen, Howrey, Simon, Arnold & White LLP, Washington, D.C., Christopher S. Colman, Rebecca L. Batchelder, Amerada Hess Corporation, Woodbridge, NJ, for Amerada Hess Corp.

Richard C. Godfrey, J. Andrew Langan, Mark S. Lillie, Kirkland & Ellis, Chicago, IL, for Atlantic Richfield Co.

Richard C. Godfrey, J. Andrew Langan, Mark S. Lillie, Kirkland & Ellis, Chicago, IL,

for BP Corp. North America, Inc. & Amoco Oil Co.

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, D.C., Dan H. Ball, Edward Cohen, Roman Wuller, Thompson Coburn LLP, St. Louis, MO, for Chevron USA, Inc.

Nathan P. Eimer, Pamela R. Hanebutt, Lisa S. Meyer, Eimer, Stahl, Klevorn & Solberg, Chicago, IL, for Citgo Petroleum Corp.

Dan H. Ball, Edward Cohen, Roman Wuller, Thompson Coburn LLP, St. Louis, MO, for Conoco, Inc.

Robert H. Shulman, Mindy G. Davis, Brent H. Allen, Howrey Simon Arnold & White, Washington, D.C., Robert E. Kelley, Jr., Houston, TX, for El Paso CGP Co.

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, D.C., for Equilon Enterprises, LLC.

Peter Sacripanti, Craig H. Zimmerman, James A. Pardo, McDermott, Will & Emery, New York, NY, Dan H. Ball, Edward Cohen, Roman Wuller, Thompson Coburn LLP, St. Louis, MO, David B. Weinstein, Kimberly Staffa Mello, Bales & Weinstein, P.A., Tampa, FL, for Exxon Mobil Corp.

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, D.C., for Motiva Enterprises, LLC.

Robert H. Shulman, Mindy G. Davis, Brent H. Allen, Howrey Simon Arnold & White, Washington, D.C., for Phillips Petroleum Co.

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, D.C., John E. Galvin, Fox Galvin, LLC, St. Louis, MO, for Shell Oil Co. and Shell Oil Products Co.

John S. Guttmann, Sy Gruza, Heather Andrade, Beveridge & Diamond, P.C., Washington, D.C., for Sunoco, Inc. (R & M).

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, D.C., for Texaco Inc. and Texaco Refining and Marketing, Inc.

Kenneth Pasquale, Melvin A. Brosterman, Christine Fitzgerald, Stroock, Stroock & Lavan, LLP, New York City, for Tosco Corp.

Edward S. Weltman, Jonathan Price, Christopher J. Garvey, Schneck, Weltman & Hashmall, LLP, New York City, for United Refining Corp.

Kenneth M. Bialo, Matthew McCoy, Baker Botts, LLP, New York City, for Valero Marketing and Supply Co.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Plaintiffs are residential well owners who brought several actions against twenty oil companies, of whom one or more had allegedly caused contamination of their well water. The suits allege negligence, strict liability, failure to warn, nuisance, trespass, and failure to report toxic substance releases as required by federal law.[1] Plaintiffs now seek to proceed as a class pursuant to Rule 23(b)(2) or, in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure.

Plaintiffs have made every conceivable argument to persuade this Court that class action treatment is appropriate in this hybrid environmental/products liability action. They suggest certification under Rule (23)(b)(1), (b)(2) and/or (b)(3). They have limited the putative class to residents of four states, although originally certification was sought for residents of twenty-one states. They are amenable to narrow rather than broad injunctive relief and suggest that notice be required if the class is certified pursuant to Rule 23(b)(2) to permit class members

---

**1.** The suits allege the following causes of action: Count I—strict liability for design defect; Count II—failure to warn; Count III—deceptive business acts and practices in violation of section 349 of New York's General Business Law ("GBL § 349") (New York plaintiffs only); Count IV— public nuisance; Count V—negligence; Count VI—breach of notification duty under the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq.;* and Count VII—conspiracy to market an unsafe product. *See* Master Complaint ("MC") ¶¶ 184–232.

to identify themselves. They further suggest that to avoid a charge of impermissible claim splitting and its attendant problems of issue or claim preclusion, the Court should frame any class certification order to preserve the right to a subsequent trial of both property damage and personal injury claims, under either Rule 16 or 42 of the Federal Rules of Civil Procedure. Finally, as a fall back position, they suggest Rule 23(c)(4) issue certification of two overarching issues—the appropriateness of injunctive relief and general liability—neither of which qualifies for class-wide adjudication. While these arguments are creative, they only highlight the poor fit between the class action device and this case. On occasion, courts have gone to "the boundary of the class action device" in granting class treatment to actions for injunctive relief, but certifying a class here would "cross into forbidden territory." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir.1997). Such treatment would stretch the decidedly elastic class action device beyond its breaking point—causing it to snap. Accordingly, plaintiffs' motion is denied.

## II. BACKGROUND

### A. Procedural History

Between October 2000 and March 2001, the Judicial Panel on Multidistrict Litigation (the "MDL Panel") consolidated and/or transferred to this Court six actions by well owners who alleged that their wells were contaminated by or were in danger of being contaminated by the presence of methyl ter-

tiary butyl-ether ("MTBE"), a gasoline additive used by defendants.[2] The defendants moved to dismiss those actions, and on August 20, 2001, that motion was granted in part and denied in part. *See In re MTBE Prod. Liab. Litig.*, 175 F.Supp.2d 593, 635 (S.D.N.Y.2001) *("MTBE I")*. Based on *MTBE I*, the following suits remained: *Berisha and O'Brien v. Amerada Hess Corp., et al.*, No. 00 Civ. 1898 *("Berisha")*; *England v. Atlantic Richfield Co., et al.*, No. 00 Civ. 7729 *("England")*; *Young v. Exxon Mobil Corp., et al.*, No. 01 Civ. 704 *("Young")*; and *Berrian v. Amerada Hess Corp., et al.*, No. 01 Civ. 1076 *("Berrian")*.[3]

On December 18, 2001, plaintiffs moved to certify a class of private well owners located in New York, Florida, California and Illinois (the "class states") whose wells have tested positive for the presence of MTBE.[4] Plaintiffs' Memorandum in Support of Their Motion for Class Certification ("Pl.Mem."). A two-day hearing was held on May 28 and 29, 2002 (the "Hearing").

### B. Facts

#### 1. Description of MTBE

In 1990, Congress enacted section 211(k) of the Clean Air Act, 42 U.S.C. § 7545(k), to reduce ozone-forming volatile organic compounds ("VOCs") and emissions of toxic air pollutants. *See MTBE I*, 175 F.Supp.2d at 600. Pursuant to the statute, the EPA mandates that gasoline blended for use in certain metropolitan areas at certain times of year

---

2. The Defendants are the following oil companies: Amerada Hess Corp. ("Amerada Hess"); Atlantic Richfield Co. ("Arco"); BP Corp. North America, Inc. ("BP Corp.") (formerly BP Amoco Corp.); Amoco Oil Co. ("Amoco"); Chevron U.S.A., Inc. ("Chevron"); CITGO Petroleum Corp. ("Citgo"); Conoco Inc. ("Conoco"); El Paso CGP Co. ("El Paso") (formerly The Coastal Corp.); Equilon Enterprises, LLC ("Equilon"); Exxon Mobil Corp. ("Exxon–Mobil"); Motiva Enterprises, LLC ("Motiva"); Phillips Petroleum Co. ("Phillips"); Shell Oil Co. ("Shell"); Shell Oil Products Co. ("Shell Products"); Sunoco, Inc. (R & M) ("Sunoco"); Texaco Inc. ("Texaco"); Texaco Refining and Marketing, Inc. ("Texaco Refining"); Tosco Corp. ("Tosco"); United Refining Co. ("United Refining"); Valero Marketing and Supply Co. ("Valero"); and Does 1–100 (collectively "the defendants"). Not all of these defendants are named in each action.

3. On December 12, 2001, this Court permitted plaintiffs to file (1) a second amended complaint in the *Berisha* action, reflecting the voluntary withdrawal of Barbara Hayes, James Hayes, and Felicia Ritters as plaintiffs, and adding James Roth as a plaintiff; and (2) a third amended complaint severing the *Berisha* action from what is now the *O'Brien* action. In addition, Donna Berisha was permitted to proceed with her own action as a severed, non-class action.

4. In *MTBE I*, those plaintiffs who sought to represent a "non-test class" of well owners claiming an imminent risk of contamination, as well as a "non-detect class" of well owners whose wells tested negative for MTBE, but might test positive in the future, were dismissed for lack of standing. *MTBE I*, 175 F.Supp.2d at 608–09.

contain at least 2.0% oxygen by weight. *See id.* In order to meet this requirement, oil companies add EPA-certified oxygenates such as MTBE to their gasoline. *See id.* (citing 42 U.S.C. § 7545(k)(4)). MTBE is currently added to about 87% of the gasoline that is marketed, sold and used in the United States. *See* 5/21/02 Hearing Before the Subcommittee on Environment and Hazardous Materials, Committee on Energy and Commerce, House of Representatives (statement of John Stephenson, Director of Natural Resources and Environment, United States General Accounting Office) ("GAO Study"), Ex. 2 to 5/24/02 Letter from Morris Ratner, plaintiffs' attorney, to the Court, at 3 n. 2.

As a consequence of the efforts to reduce air pollution there has been an increase in water pollution caused by gasoline. When MTBE spills or leaks into the ground, its chemical properties cause it to travel through soil faster and farther than other gasoline components.[5] *See* "Hydrology and Contaminant Transport" Slides ("3/24/00 EPA Rpt."), Ex. P–1[6] at 10 (excerpting 3/24/00 EPA Advance Notice of Intent, Ex. C to Morris Ratner's Declaration in Opposition to Defendants' Motion to Dismiss ("Ratner Decl.")); Brown Rpt. at 3–4. *See also* MC ¶¶ 49–50. In addition, MTBE's non-biodegradability causes it to persist in soil and groundwater for decades. *See* 3/24/00 EPA Rpt. at 10; Brown Rpt. at 3. As a result of these charac-

teristics, MTBE is often the sole compound found in contaminated groundwater. *See* 2/13/01 Summary of Expert Opinions of Philip B. Bedient, Ph. D., P.E., Expert Witness for Plaintiffs ("Bedient Rpt."), Ex. 6 to Pl. Trial Plan Exs. Vol. 1, at 6.

MTBE's fate[7] and transport characteristics are of particular concern because MTBE is a known animal carcinogen, as well as a possible human carcinogen.[8] *See* Brown Rpt. at 4. In addition, even low levels of MTBE will give water a turpentine-like taste and odor. *See* 3/8/93 Taste and Odor Threshold Report by Campden Food & Drink Research Association for Arco ("1993 Campden Rpt."), Ex. 41 to Plaintiffs' Appendix ("Pl.App."); *see also* MC ¶ 52; 3/24/00 EPA Rpt.

### 2. Defendants' Alleged Conspiracy to Use MTBE

Plaintiffs allege that, because MTBE is cheaper than other oxygenates, it has become the industry's "oxygenate of choice." *MTBE I*, 175 F.Supp.2d at 600. They allege that the defendants engaged in joint efforts to use and market MTBE despite their knowledge that it poses a serious threat to groundwater, and despite the availability of safer alternatives. *See* MC ¶ 2. Defendants are also accused of acting in concert, via participation in trade organizations, "to conceal the problems associated with MTBE, to

---

5. A government study conducted over an eight-year period from 1993–2000 concluded that releases from underground gasoline storage systems ["USTs"] are the main source of MTBE groundwater contamination. *See* 11/1/01 Hearing Before the Committee on Energy and Commerce, Subcommittee on Oversight and Investigations (Statement of Robert Hirsch, United States Geological Survey ("USGS") Associate Director for Water) ("USGS Stmt."), Ex. 50 to Joint Appendix ("Jt.App."), at 6–7; James E. McCarthy and Mary Tiemann, Environment and Natural Resources Division of the EPA, "MTBE in Gasoline: Clean Air and Drinking Water Issues," Report for Congress (July 1998) ("7/98 EPA Rpt."), Ex. 51 to Jt.App., at 1, 4. As a result, "Leaking Underground Storage Tank" ("LUST") programs have been established in many states. *See id.* at 4. These programs fund cleanup, aid tank owners and operators in complying with state and federal regulations, and reimburse claims. *See, e.g.,* Illinois EPA, 2000 Annual Report: LUST Program, Ex. 56–B to Jt.App., at 1–17. Other sources of MTBE groundwater con-

tamination include "small releases and leaks such as automobile accidents, overfills and improper disposal." Report of Plaintiffs' Expert, Anthony Brown ("Brown Rpt."), Ex. 8 to Plaintiffs' Trial Plan Exhibits ("Pl. Trial Plan Exs.") Vol. 1, at 3.

6. "Ex. P–X" refers to plaintiffs' exhibits entered into evidence at the Hearing and "Ex. D–X" refers to defendants' exhibits entered into evidence at the Hearing.

7. "Fate" is the term used to describe "the interactions between contaminants and the physical, chemical and biological components of the subsurface [of the soil]." Report of Plaintiffs' Expert, Joseph B. Hughes ("Hughes Rpt."), Ex. 7 to Pl. Trial Plan Exs. Vol. 1, at 1.

8. No personal injury claims are asserted on behalf of the class or, it appears, by any of the individual named plaintiffs. Several named plaintiffs, however, seek medical monitoring. *See* Second Amended Complaint (*Berrian*) ¶ 0.5.

proliferate its use; to pollute Plaintiffs' wells, and to avoid responsibility for their contamination."[9] *Id.*

### 3. The Extent of MTBE Contamination

Most states, including the class states, have reported that they find MTBE in groundwater in at least 20% of samples. *See* 3/24/00 EPA Rpt. at 10. A 1993–1994 national survey of private drinking wells conducted by the USGS found that 27% of samples taken in shallow, ambient[10] groundwater contained MTBE. *See* Bedient Rpt. at 2 (citing, in addition, more recent studies which conclude that MTBE poses a "significant risk to the nation's drinking water supply").

Nevertheless, a recent nationwide study concluded that only one out of 2,243 (mostly public) drinking wells contained MTBE at a concentration above the EPA's advisory of 20 parts per billion ("ppb"). *See* USGS Stmt. at 3. Moreover, because plaintiffs seek remediation and other forms of injunctive relief, defendants have presented evidence that the class states have programs in place that have provided, and will continue to provide, adequate remedies, whenever a private well is contaminated with MTBE at or above a given state's action level or maximum contaminant level ("MCL").[11]

### 4. Low Levels of MTBE in Private Wells

The focus of this litigation, however, is on private water wells, and levels of MTBE below state action levels or federal advisories. Private wells are subject to very little government regulation, and there are no Federal or state requirements that private wells be tested. *See* Brown Rpt. at 4. Because private wells tend to be shallower than public wells, they are also more susceptible to contamination by MTBE. *See* 4/18/01 Deposition of Philip B. Bedient ("4/18/01 Bedient Dep.") at 89; Transcript of Hearing ("Tr.") at 46 (testimony of Bedient). And while state MCLs range from 5 ppb to 70 ppb, some people are able to taste and smell the chemical at levels as low as 0.1 ppb.[12] 1993 Campden Rpt. at 2, 5 (reporting results of study using thirteen "experienced assessors"). Contamination at 0.1 ppb is also the lowest level at which current technology can detect the presence of the compound in water. *See* Tr. at 89 (testimony of Bedient).

### 5. The Named Plaintiffs

The named plaintiffs each use or own a private water well that has tested positive for MTBE. Five are from New York, including the named plaintiffs in *O'Brien* and *Berrian.* The three named plaintiffs in *England* are from Illinois and California, and the named plaintiff in *Young* is from Florida. *See* Pl. Tr. Plan at 5.

#### a. O'Brien (New York)

Robert O'Brien is a resident of New York and private well owner in Laurel, New York.

---

9. For further details of plaintiffs' allegations regarding what the various defendants knew and when they knew it, *see MTBE I,* 175 F.Supp.2d at 600–01 (detailing the white papers circulated within the industry reporting on the harmful effects of MTBE, the widespread contamination, and the availability of safer alternatives) (citing MC ¶¶ 66–137). *See also* Plaintiffs' Preliminary Trial Plan ("Trial Plan" or "Pl. Tr. Plan") at 12–32 (presenting evidence that plaintiffs propose to use at a classwide trial to establish defendants' liability).

10. "Ambient" in this context describes groundwater not located near a UST. *See* Bedient Rpt. at 2.

11. In New York, for example, regional offices of the Department of Environmental Conservation ("New York DEC") collect samples from private wells at no cost to the owner whenever MTBE contamination is suspected. *See* "Private Well Policies for Eighteen States in Complaint" ("Def. States Rpt."), Ex. 4 to Expert Report of Defendants' Expert, Robert H. Harris, Ph. D. ("Harris Rpt."), Ex. 14 to Jt.App., at 1. New York has set an M.C.L. § of 50 ppb for MTBE, at or above which the State will initiate cleanup and pay the costs necessary to mitigate risks to the homeowner. *See* "State Standards or Guidelines for MTBE in Ground Water" ("Def. M.C.L. § Rpt."), Ex. 3 to Harris Rpt., at 1. In addition, New York considers water contaminated at a level at or above 10 ppb to be unpotable. *See id.* The remaining class states have similar programs and cleanup funds, *see* Def. States Rpt. at 1, and have set MCLs as follows: 70 ppb (Illinois); 13 ppb for health, and 5 ppb for taste/odor (California); 500 ppb for "low yield" ground-water and 50 ppb for drinking water (Florida). *See* Def. M.C.L. § Rpt. 1.

12. The defendants presented contrary evidence on this point.

*See* Defendants' Report on Robert O'Brien ("Def. O'Brien Rpt."), Ex. 17–A to Jt.App., at 2. In April 1997, tests done on O'Brien's well indicated that it was contaminated at a concentration of 75 ppb. *See MTBE I*, 175 F.Supp.2d at 604; Def. O'Brien Rpt. at 3. In nine of the ten tests done on O'Brien's well since May 19, 1997, however, O'Brien's well has not shown the presence of any MTBE. *See* Def. O'Brien Rpt. at 3. Like all of the named plaintiffs, however, O'Brien has no guarantee of future testing.

### b. Reynolds (New York)

Adeleine Reynolds is a named plaintiff in *O'Brien.* She and her husband are residents of New York and own a well in Putnam County. *See* Declaration of Adeleine Reynolds in Support of Class Certification ("Reynolds Decl."), Ex. A to Ratner Decl., ¶¶ 2–3. The Reynolds live next door to an Exxon–Mobil gas station. *See* 1/18/02 Deposition of Adeleine Reynolds ("Reynolds Dep."), Ex. 19 to Jt.App., at 16, 18. In 1997, the Reynolds first noticed that their water was beginning to taste and smell like turpentine and was causing their eyes and skin to burn. *See id.* ¶ 4. Over the course of 1997, 1998 and 1999, the Reynolds called New York DEC about their water problem but received no response. *See id.* ¶ 6. DEC first tested their water for MTBE in June 1999, finding that the chemical was present at a concentration of 1500 ppb.[13] *See id.* ¶ 8. Shortly after the discovery, Hudson Valley Water Resources of New Paltz installed a water filtering system in the Reynolds' home. *See id.* ¶ 10. In addition, in March 2001, Exxon–Mobil contracted with a private environmental services company to conduct maintenance and periodic sampling of the Reynolds' water system. *See id.* ¶ 14. Despite the Reynolds' request for copies of all test results, however, the environmental services company would not provide them. *See id.*

In November 2001, the Reynolds experienced a "breakthrough" of MTBE in the filtration system, *see id.* ¶ 15, *i.e.,* the carbon filter was saturated and MTBE seeped through the filter in detectable amounts, *see* Tr. at 168–69 (testimony of Bedient). The company hired by Exxon–Mobil has since cleaned the tanks and replaced the carbon in the filter. *See* Reynolds Decl. ¶ 15.

### c. The Berrians (New York)

The named plaintiffs in *Berrian,* Colleen and Robert Berrian, are residents of the Greenbush subdivision in Hyde Park, New York. *See MTBE I*, 175 F.Supp.2d at 605; 12/9/01 Affidavit of Colleen Berrian In Support of Plaintiffs' Motion for Class Certification ("Berrian Aff."), Ex. B to Ratner Decl., ¶ 1. In early 2000, Ms. Berrian learned that her neighbor's well contained MTBE. *See id.* ¶ 4. After many unsuccessful attempts to persuade the New York DEC to test her water, Ms. Berrian finally had her well tested in October 2000, revealing that MTBE was present at 5.5 ppb. *See id.* ¶¶ 6–9. Despite her requests, however, Ms. Berrian has never received a filter. *See id.* ¶ 11. New York DEC has identified several nearby gas stations—Sunoco (formerly VIO & Getty), Citgo, CENCO (formerly Exxon and Citgo) and BP (formerly ATI) Service Stations—as "potentially responsible parties." Hyde Park DEC Fact Sheet (November 2000), Ex. 73 to Jt.App., at 2. New York DEC has spent $1.9 million, and will seek contribution from these oil companies, to provide an alternate water supply for all residents of the Greenbush subdivision. *See* Defendants' Report on the Berrians ("Def. Berrians Rpt."), Ex. 17–C to Jt.App., at 2.

### d. Roth (New York)

James Roth, a private well owner and named plaintiff in the *Berrian* action, lives next door to the Berrians in the Greenbush subdivision in Hyde Park, New York. *See* Defendants' Report on James C. Roth ("Def. Roth Rpt."), Ex. 17–D to Jt.App., at 1. Roth uses water from his well for bathing, but not for consumption. *See id.* He has used bottled water for consumption " 'for as long as he can remember.' " *Id.* (quoting 1/15/02 Deposition of James C. Roth ("Roth Dep."),

---

**13.** The Reynolds' well water also contains coliform, another contaminant. *See* Reynolds Dep.

at 28.

Ex. 22 to Jt.App., at 52). Since November 2000, DEC has tested Roth's well without charge on a quarterly basis, and the highest reading has been 3 ppb. *See id.* at 1.

### e. Young (Florida)

The named plaintiff in *Young* is Rebecca Young, a resident of Florida and owner of a private well. Some time in the fall of 1999, Ms. Young and her husband first noticed a "strong, foul gasoline-like smell and foul taste from [their] well water." 12/15/01 Declaration of Rebecca Young in Support of Plaintiffs' Motion for Class Certification ("Young Decl."), Ex. M to Ratner Decl. In December 1999, the Youngs' well tested positive for MTBE at a concentration of 440 ppb. *See id.* ¶ 7. A filter was installed, but the Youngs did not feel that it restored the water to its previous, uncontaminated quality. *See id.* ¶ 8. The Youngs began to experience skin rashes, and were advised by the Hillsborough County Department of Health to discontinue using their water. *See id.* ¶¶ 8–9. The Youngs sought and received coupons from the State Water Supply Restoration Program, which they redeemed for free bottled water. *See* 1/8/02 Deposition of Rebecca Young ("Young Dep."), Ex. 23 to Jt.App., at 100. Around May 2000, the Youngs were connected to the City of Tampa water supply. *See* Young Decl. ¶ 9. Because they must pay for City of Tampa water, and because they enjoyed using their well before it was contaminated, the Youngs seek groundwater remediation. *See id.* ¶ 10.

Defendants maintain that Ms. Young built a well on her property without a permit, which provides them with a complete defense to her claims under Florida law. *See* Defendants' Opposition to the Motion for Class Certification ("Def.Opp.") at 36 n. 47.

### f. England and Aylward (Illinois and California)

David England and Rhonda Aylward, the named plaintiffs in the *England* action, are private well owners in Edwardsville, Illinois. In August 2000, a test of England's well conducted by investigators working with the law firm of Carr, Korein showed the presence of MTBE at a concentration of 3 ppb.

*See MTBE I,* 175 F.Supp.2d at 605 n. 13. The same investigators approached Aylward, and a test of his well showed MTBE contamination of 20.6 ppb. *See* Defendants' Report on Rhonda Aylward ("Def. Aylward Rpt."), Ex. F to Jt.App., at 1. Neither England nor Aylward, however, contacted any public agency or inquired about testing or cleanup programs. *See* 5/9/01 Deposition of David J. England ("England Dep."), Ex. 24 to Jt.App., at 20–21; Def. Aylward Rpt. at 1. Nor has either plaintiff provided an affidavit in support of the motion for class certification.

### g. Christensen (Illinois and California)

Claudia Christensen, a resident of California and owner of a well, is also a named plaintiff in *England.* In 1995, Ms. Christensen and her husband began to notice that their well water smelled and tasted like chemicals. *See* Declaration of Claudia Christensen ("Christensen Decl."), Ex. I to Ratner Decl., ¶ 4. Ms. Christensen was especially concerned about the effects on her water from a neighboring store called Big Trees Market when she learned that its gas tanks had not been tested since 1992, and whose underground tanks were not in compliance with county or state regulations. *See id.* ¶¶ 4–5. In November 1999, Amador County reported that Big Trees Market had MTBE in its groundwater at a level above the state standard, which could pose a threat to the Christensens' well water. *See id.* ¶ 7.

When the County finally tested the Christensens' water in December 1999, two samples showed MTBE contamination of 57 ppb and 110 ppb. *See id.* The County advised the Christensens not to drink the water or use it for cooking, so they began purchasing bottled water at their own expense. *See id.* In May 2001, the County placed a filter on the Christensens' well, which they now use for some purposes. *See id.* ¶ 8. However, they continue to use bottled water for drinking and cooking. *See id.* A California state agency issued a Cleanup and Abatement Order to Big Trees Market, which required the store to clean up its own property and pay for testing of the Christensens' well. *See* 5/21/01 Deposition of Claudia Christensen

("Christensen Dep."), Ex. 26 to Jt.App., at 65–66.

#### 6. The Declarants

Plaintiffs also provide declarations from other residents from New York, Florida, California and Illinois to illustrate the extent of the MTBE problem as well as the proliferation of MTBE-related lawsuits. Many of the declarants seek to recover for personal injuries allegedly caused by MTBE. *See, e.g.,* 12/13/01 Affidavit of Rose Pfleger ("Pfleger Aff."), Ex. F to Ratner Decl., ¶ 6 (miscarriage); Defendants' Report on Mary Ann Konger ("Def. Konger Rpt."), Ex. 17–P to Jt.App., at 2 (autoimmune disease, diabetes, arthritis, and shingles). Several of the declarants enjoy the use of a well, but do not own real property with a well located on it. *See, e.g.,* 12/9/01 Affidavit of Annette Katz ("Katz Aff."), Ex. C to Ratner Decl., ¶¶ 1–2. The declarants' pending lawsuits, separate from this MDL action, target the oil companies that they believe are directly responsible for the contamination of their well water. *See, e.g.,* Declaration of Cheryl Campbell in Support of Plaintiffs' Motion for Class Certification ("Campbell Decl."), Ex. K to Ratner Decl., ¶ 11; Def. Konger Rpt. at 2. As with the named plaintiffs, most of the declarants live near a current or former gas station or underground storage tank, or a known pipeline leak. *See, e.g.,* 11/23/01 Declaration of John and Roberta Costisick In Support of Plaintiffs' Motion for Class Certification ("Costisick Decl."), Ex. D to Ratner Decl., ¶ 5 (now-closed Big Saver station was five properties away); Defendants' Report on Rose Pfleger ("Def. Pfleger Rpt."), Ex. 17–N to Jt.App. (Getty station is one mile away).

#### C. Plaintiffs' Plan—Mechanics

#### 1. Trial Plan and Class Definition

Plaintiffs seek to certify the class or classes for injunctive relief only and plan to pursue damages on an individual basis. In support of a classwide trial, plaintiffs prepared a lengthy trial plan, submitted 134 exhibits in connection with their motion for class certification, and offered testimony at the hearing. If the actions are voluntarily consolidated, the Court could hold one classwide trial—and the jury could receive separate instructions by state. *See* Trial Plan at 6. Alternatively, plaintiffs suggest certifying subclasses by state, allowing this Court to try the New York subclass while other subclasses would be tried in their respective home districts. *See id.*

The Trial Plan contains examples of the nature and order of proof that would be presented to establish the claims of the named plaintiffs and all class members.[14] *See id.* at 1. At the hearing, plaintiffs presented a litigation roadmap to summarize the mechanics of the proposed trial:

1. Certify class [15]
2. Class-wide merits discovery
3. Class trial
4. Judgment on liability and injunctive order setting out circumstances under which class members would be entitled to relief
5. Appoint special master or claims resolution facility
6. Send out Rule 23(b)(2) notice to class members describing steps to be taken for them to demonstrate class membership to participate in the relief

*See* Tr. at 248–49. At stage 6, plaintiffs would utilize notice by publication as well as

---

**14.** Plaintiffs would present evidence regarding the following classwide issues: (1) MTBE's chemical, fate and transport characteristics; (2) defendants' economic motives in choosing MTBE; (3) MTBE's interference with the use and enjoyment of plaintiffs' property; (4) foreseeability of MTBE's environmental consequences; (5) defendants' knowledge of MTBE's characteristics; (6) each defendant's participation in a joint scheme to suppress information regarding MTBE's true characteristics, and to mislead the plaintiffs and the public; (7) defen-

dants' failure to warn of MTBE's harmfulness; (8) causation; (9) defendants' joint liability; and (10) the existence of alternative oxygenates. *See* Trial Plan at 8–33 ("Proof of Liability").

**15.** Plaintiffs suggest that at this first stage the Court could, in its discretion, provide for notice and opt-out even for a(b)(2) class. *See* Pl. Mem. at 34 (citing Fed.R.Civ.P. 23(d)(2)); Trial Plan Part I.C.; *see also infra* note 45 (discussing (b)(2) certification and notice options).

conduct direct mail notice using existing lists of contaminated private wells that have been developed by state agencies and private investigators. *See id.* at 249. Notice by publication would give putative class members a chance to come forward to demonstrate that they meet the following criteria:

1. Ownership of or interest in real property;

2. With one or more water wells on it;

3. Contaminated with a detectable level of MTBE, whether or not the well owner is aware of it;

4. The well provides, or may provide, a source of water for drinking; and

5. Such property is located in New York, California, Illinois or Florida

*See* Tr. at 239–42.

**2. Testing**

A well owner who desires to establish class membership (who is not on an existing "detect" list) would be required to test her own water. To this end, plaintiffs propose that testing kits be sent to every well owner who comes forward in response to the mail or publication notice.[16] *See* Brown Rpt. at 6. The well owner would bear the cost of about $100–200 per kit. *See id.; see also* 5/2/02 Declaration of Marco Kaltofen, Plaintiffs' Expert ("Kaltofen Decl.") ¶ 7 ($50 to $150 per sample for laboratory analysis). At the Hearing, plaintiffs' expert Anthony Brown explained at some length that each homeowner, using the kit, could collect a water sample pursuant to EPA Water Testing Protocol 524.2 and that the sample would be sent to a laboratory for testing. *See* Tr. at 59–82 (testimony of Brown) (citing to "Method 524.2: Measurement of Purgeable Organic Compounds In Water by Capillary Column

Gas Chromatography/ Mass Spectrometry" ("Testing Protocol" or "EPA Protocol 524.2"), Ex. D–1, ¶ 8 ("Sample, Collection, Preservation and Storage")).

Brown testified that the EPA Testing Protocol embodies standard industry practice pursuant to which a home testing program could be "simply" designed and implemented. *Id.* at 68–69. According to Brown, home testing would thus involve the following steps. A laboratory would send at least two presterilized vials, each containing two drops of hydrochloric acid. *See id.* at 69, 72–73. Due to the potential for danger inherent in hydrochloric acid—which might splash into eyes or skin—the kits would probably also include disposable goggles and rubber gloves. *See id.* at 73–75.

The Testing Protocol instructs the sample-collector (homeowner) to open the tap and allow the system to flush until the water temperature has stabilized, usually about ten minutes. *See* EPA Protocol 524.2 ¶ 8.1.2. The collector must then adjust the flow to 500 milliliters per second and take duplicate samples.[17] *See id.* The collector is instructed to fill the vials to "overflowing," but to take care not to flush out the "rapidly dissolving dechlorinating agent." *Id.* ¶ 8.1.4. The Protocol then requires that the samples be chilled at four degrees Celsius and maintained at that temperature until they can be analyzed at the laboratory. *See id.* ¶ 8.2.1. The sample-collector must then pack the samples for shipment to the laboratory with enough ice to ensure that they will arrive at the laboratory with "a sufficient amount of ice remaining in the cooler." *Id.* On further cross examination, Brown conceded that he had never relied on a home-collected water sample to determine the level of contamination in water.[18] *See* Tr. at 82.

**16.** Plaintiffs have estimated that there are several million well owners in New York, Florida, California and Illinois. Plaintiffs predict that only a small percentage of that universe would come forward to request testing. Of those individuals, approximately 20% would meet the criteria for class membership, which plaintiffs estimate to total several tens of thousands. *See* Pl. Mem. at 8.

**17.** Before collecting the samples, the homeowner would need to determine whether her water was chlorinated and, if so, add 25 milligrams of as-

corbic acid per 40 milliliters water in order to dechlorinate it. *See* EPA Protocol 524.2 ¶ 8.1.2. At the Hearing, Brown testified that this potential difficulty could be circumvented by requiring the laboratory to send out duplicate sets of vials, one set containing the ascorbic acid and one set without it. *See* Tr. at 71.

**18.** Due to the technical nature of the process, it is usually performed by a trained technician. *See* Tr. at 78–80.

## III. STANDARD FOR CLASS CERTIFICATION

 Rule 23 of the Federal Rules of Civil Procedure sets forth the requirements for bringing and maintaining a class action in federal court. Fed.R.Civ.P. 23; *see also infra* Part IV. " 'In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.' " *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 (2d Cir. 2001) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). While this Circuit has "directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation," *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 504 (S.D.N.Y. 1996) (citing *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208–09 (2d Cir.1972)), a court may not grant certification unless it is satisfied, after " 'rigorous analysis,' " that the criteria set forth in Rule 23 are met. *See Dodge v. County of Orange*, 208 F.R.D. 79, 87 (S.D.N.Y.2002) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Plaintiffs bear the burden of establishing each requirement for class certification. *See Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y.2000).

 The district court must accept all of the allegations in the pleadings as true on a motion for class certification, and avoid conducting a preliminary inquiry into the merits. *See In re Indep. Energy Hldgs. PLC Sec. Litig.*, No. 00 Civ. 6689, 2002 WL 1059086, at *1 n. 5 (S.D.N.Y. May 28, 2002) (citations omitted); *Pecere*, 194 F.R.D. at 69. Nonetheless, the decision whether to certify a class " 'may involve some consideration of the factual and legal issues that comprise the plaintiff[s'] cause of action.' " *Pecere*, 194 F.R.D. at 69 (quoting *D'Alauro v. GC Servs.*

*Ltd.*, 168 F.R.D. 451, 454 (E.D.N.Y.1996)). *See also Daniels v. City of New York*, 198 F.R.D. 409, 413 n. 5 (S.D.N.Y.2001) (noting that the court need not rely on the bare allegations but "may consider the range of proof necessary to support class certification").

## IV. DISCUSSION—CLASS CERTIFICATION

To be certified as a class under Rule 23, plaintiffs must satisfy all requirements of subsection (a) and must prove that the class is "maintainable" as defined in subsection (b).

### A. Rule 23(a)

Rule 23(a) requires that plaintiffs demonstrate that the proposed class: (1) is sufficiently numerous; (2) has at least one common question of fact or law; (3) presents claims that are typical of the class as a whole; and (4) will adequately represent the class. Fed.R.Civ.P. 23(a). Because plaintiffs have demonstrated that the proposed class meets the first two requirements, I only discuss typicality and adequacy below.[19] In addition, while "Rule 23(a) does not expressly require that a class be definite in order to be certified [,] a requirement that there be an identifiable class has been implied by the courts." *Zapka v. Coca–Cola Co.*, No. 99 Civ. 8238, 2000 WL 1644539, at *2 (N.D.Ill. Oct.27, 2000) (quoting *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir.1977) (quotation marks omitted)). This implied requirement is often referred to as "ascertainability." *See Van West v. Midland Nat'l Life Ins. Co.*, 199 F.R.D. 448, 451 (D.R.I.2001); *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 358 (D.Wis.2000). This requirement is also discussed briefly here.

### 1. Implied Requirement of Ascertainability

 Defendants argue that the proposed class does not meet the threshold require-

---

**19.** Defendants appear to concede that plaintiffs have identified at least one common question of law or fact, and have thus satisfied the commonality requirement. They disagree, however, as to numerosity. *See* Def. Opp. at 36–37 (citing recent government study that only one in the 2,243 drinking water wells sampled contained MTBE

over the EPA guideline). Because plaintiffs' proposed class consists of persons whose wells are contaminated with *any* MTBE, and because they make a reasonable estimate of the class size numbering in the tens of thousands, I find that this requirement has been met.

ment of ascertainability. "An identifiable class exists if its members can be ascertained by reference to objective criteria." *Zapka,* 2000 WL 1644539, at \*2. *See also Clay v. American Tobacco Co.,* 188 F.R.D. 483, 490 (S.D.Ill.1999); *Gomez v. Illinois State Bd. of Educ.,* 117 F.R.D. 394, 397 (N.D.Ill.1987). Where any criterion is subjective, *e.g.,* state of mind, the class is not ascertainable. *See Zapka,* 2000 WL 1644539, at \*3 (declining to certify class where definition referred to state of mind—"all individuals who consumed diet Coke *deceived* by marketing practices ... into *believing* that fountain diet Coke does not contain saccharin") (emphasis added). Class members need not be ascertained prior to certification, but "the exact membership of the class must be ascertainable at some point in the case." *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y.1983).

 Here, plaintiffs' class definition refers only to objective criteria: Either a well has MTBE or it does not; either an individual has an ownership interest in a well or she does not; either her property is located in a class state or it is not. Thus, this proposed class meets Rule 23(a)'s implied requirement that it be theoretically "ascertainable." [20]

## 2. Typicality

 Defendants challenge the typicality of the named plaintiffs. The named plaintiffs' claims are "typical" pursuant to Rule 23(a)(3) where each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendants' liability. *See Robinson v. Metro-North Commuter R.R.*

Co., 267 F.3d 147, 155 (2d Cir.2001). "The rule is satisfied ... if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Marisol A. v. Giuliani,* 929 F.Supp. 662, 691 (S.D.N.Y.1996), *aff'd,* 126 F.3d 372 (2d Cir. 1997).

While the test for typicality "is not demanding," *Forbush,* 994 F.2d at 1106 (citing *Shipes v. Trinity Indus.,* 987 F.2d 311, 316 (5th Cir.1993)), it is not met here. Plaintiffs argue that their claims stem from the same allegations—defendants conspired to use and market a product, made efforts to conceal its defects, failed to warn, and caused the contamination of plaintiffs' wells because they knew that it was reasonably foreseeable that gasoline would be released into the environment. While the named plaintiffs make the same legal arguments as the proposed class, their claims must also derive from the same course of conduct. Yet, the contamination of each named plaintiff's well comes about through a factually unique set of circumstances, *e.g.,* a leaking UST owned by Big Saver, a burst pipeline, etc. *See supra* Part II.

 Applying a market share theory of liability to plaintiffs' case illustrates that the named plaintiffs' claims are not typical. "Under market-share liability, when a plaintiff is unable to identify the specific manufacturer of a fungible product that caused her injury, the plaintiff may recover damages from a manufacturer or manufacturers in proportion to each manufacturer's share of the total market for the product." *MTBE I,*

---

**20.** It must also be "administratively feasible for a court to determine whether a particular individual is a member" of the class. *Rios,* 100 F.R.D. at 403 (citing 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* § 1760 at 581 (1972)). "The Court must be able to make this determination without having to answer numerous fact-intensive inquiries." *Daniels,* 198 F.R.D. at 414. Defendants argue that the Court must find the following facts for each putative plaintiff: (1) ownership interest in a well; (2) how the well is being used; (3) whether the owner has access to filtered water or water from a public water supply; (4) whether she has already received relief from a governmental entity or responsible party; and (5) whether the well contains any MTBE. *See* Def.

Opp. at 3–8 & n. 6. I disagree. The Court is not required to make such findings at the class certification stage. Certainly, each potential plaintiff need not prevail on the merits in order to qualify as a class member, a theory which "would preclude certification of just about any class of persons alleging injury from a particular action." *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1104–06 (5th Cir.1993). There is no question in this case, however, that it would be administratively burdensome for this Court, or a claims facility this Court would designate, to determine whether a particular individual is a class member. This problem, however, is primarily one of manageability, and not ascertainability. *See also infra* Part IV.B.1.c.

175 F.Supp.2d at 619 (citing, *inter alia, Hymowitz v. Eli Lilly Co.*, 73 N.Y.2d 487, 502, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989)). Most of the class representatives can identify a responsible gasoline manufacturer with ease because they live near a point source of gasoline pollution, and therefore face an uphill battle in utilizing a market share theory. The ambient well owners, on the other hand, cannot identify the manufacturer or manufacturers of the MTBE that allegedly contaminates their wells.[21] *See supra* note 10 (defining ambient in this context). Thus, in this critical respect, the named plaintiffs' claims are not typical of the claims of the class.[22]

### 3. Adequacy of Representation

■ Even if the Court accepted plaintiffs' argument regarding typicality, plaintiffs must also show that the proposed action will fairly and adequately protect the interests of the class. *See* Fed.R.Civ.P. 23(a)(4); *Banyai v. Mazur*, 205 F.R.D. 160, 164 (S.D.N.Y. 2002). To do so, they must first demonstrate that "class counsel is qualified, experienced, and generally able to conduct the litigation." *In re Drexel Burnham Lambert Group, Inc.*,

960 F.2d 285, 291 (2d Cir.1992). Here, defendants do not dispute that plaintiffs' counsel, especially plaintiffs' liaison counsel, are eminently qualified and experienced in conducting this type of class litigation.

■ Plaintiffs are also required to show that potential class representatives have no interests that are antagonistic to proposed class members and share the desire to vigorously prosecute the action. *See id.; see also Robinson,* 267 F.3d at 170 (Rule 23(a)(4) requires "absence of conflict" between named representatives and class, as well as "vigorous prosecution"). Defendants contend that this requirement is not met because "class counsel's claims-splitting approach—suing now for what they claim is merely 'injunctive' relief—is sure to haunt the few absent class members whose wells may actually have MTBE levels of regulatory significance...." Def. Opp. at 30. Absent class members may bring suit later—for personal injury or property damage—only to be "told ... that they had impermissibly split a single cause of action." *Id.* at 32 (quoting *Feinstein v. Firestone Tire and Rubber Co.*, 535 F.Supp. 595, 606 (S.D.N.Y.1982)).[23]

**21.** Plaintiffs claim that "due to the large number of possible sources and the extreme solubility and mobility of MTBE in the environment, ... ambient non-point source contamination by MTBE is common." Pl. Trial Plan at 31–32 (citing Bedient Dep. at 49, 57–60, 138–39). It is unclear, however, whether any named plaintiff or declarant fits this description. Plaintiffs' market share theory also relies upon the blending of different brands of gasoline at different stages in the production and refining process.

**22.** Defendants also argue that plaintiff Rebecca Young cannot be a class representative because she is subject to unique defenses. They assert that she did not obtain a permit to drill a well on her property, in violation of Florida law. *See* Def. Opp. at 36 n. 47 (citing *Village of Tequesta v. Jupiter Inlet Corp.*, 371 So.2d 663, 671–72 (Fla. 1979) for proposition that failure to obtain required water use permit precludes a landowner from having a vested property right in the water below the property). Because Young is the only Florida plaintiff, defendants argue that the motion to certify a Florida class must be denied. *See id.*

A putative class representative's claims are not typical if that representative is subject to unique defenses. *See Gary Plastic Packaging Corp. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990) (refusing to certify

class of defrauded investors where there was evidence that the only named plaintiff would be subject to defense that it had notice of fraud). The test is whether the defenses will become the focus of the litigation, thus overshadowing the primary claims, and prejudicing other class members. *See Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989). The Court need not decide this issue, however, because plaintiffs fail to satisfy the typicality requirement. Further, the action is not maintainable. *See infra* Parts IV.B.1.–2. (discussing Rule 23(b)).

**23.** Defendants argue that conflicts of interest are particularly problematic in a Rule 23(b)(2) class action where there is no opt-out provision. Defendants contend that the Court cannot simply order notice and opt-out to cure this problem:

> When a class action is certified under Rule 23(b)(2) ... all persons comprising the class become mandatory members. In other words, all those who come within the description in the certification become, and must remain, members of the class because no opt-out provision exists.

Def. Opp. at 33 (quoting *Daniels*, 198 F.R.D. at 415). The problems with providing notice and opt-out in this case are addressed in Part IV. B.1.c., *infra.* Further, there can be little doubt that "the right to opt out does nothing to protect

■ Claim-splitting is generally prohibited by the doctrine of res judicata, *see* Rest. Jmts.2d § 24, which bars parties to a prior action or those in privity with them from raising in a subsequent proceeding any claim they *could* have raised in the prior one, where all of the claims arise from the same set of operative facts, *see Cowan v. Ernest Codelia, P.C.*, 149 F.Supp.2d 67, 73 (S.D.N.Y. 2001) (citation, quotation marks omitted). New York, Florida, California and Illinois all embrace this general prohibition against claim-splitting. *See, e.g., Ramsey v. Busch*, 19 F.Supp.2d 73, 83–84 (W.D.N.Y.1998) ("New York law follows a transactional approach to res judicata which bars the relitigation of not only matters that were litigated between parties in a preceding action, but also any matters that could have been litigated in that action.") (citation omitted); *Gaynon v. Statum*, 151 Fla. 793, 10 So.2d 432, 433–34 (1942) ("We recognize the rule against the splitting of causes of action and that as a general rule . . . all damages sustained or accruing to one as a result of a single wrongful act must be claimed and recovered in one action or not at all."); *Mason v. Parker*, 295 Ill.App.3d 1096, 230 Ill. Dec. 861, 695 N.E.2d 70, 72 (5th Dist.1998) ("An entire claim arising from a single tort cannot be divided and be the subject of several actions . . . .") (alteration omitted); *see also* "Summary of the Four States' Prohibitions Against Claims–Splitting," Ex. 2 to Jt. App., at 1–4.

■ While not expressly acknowledging this res judicata problem, plaintiffs ask that they be permitted to preserve their right to maintain later actions for damages. *See* Plaintiffs' Reply Memorandum in Support of Motion for Class Certification ("Pl. Reply Mem.") 18–20. As plaintiffs correctly note, courts generally allow plaintiffs in class actions to sue for injunctive relief on behalf of the class and then bring damages claims in subsequent individual actions. *See, e.g., Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996); *Fortner v. Thomas*, 983 F.2d 1024, 1031 (11th Cir.1993); *Norris v. Slothouber*, 718 F.2d 1116, 1117 (D.C.Cir.1983) (holding that "a suit for damages is not precluded by reason of the plaintiff's membership in a class for which no monetary relief is sought"); *Crowder v. Lash*, 687 F.2d 996, 1008–09 (7th Cir.1982) ("[W]e find it unacceptable . . . to require a [plaintiff] to elect between joining an ongoing class suit and thereby forfeiting his right to seek individual damages, on the one hand, and removing himself from the class (and hence risking exclusion from any equitable relief granted) in order to preserve the possibility of bringing a subsequent damage action, on the other."); *Herron v. Beck*, 693 F.2d 125, 127 (11th Cir.1982); *Bogard v. Cook*, 586 F.2d 399, 408–09 (5th Cir.1978); *Daniels*, 198 F.R.D. at 416. Relying on these cases, all of which involve classes alleging civil rights violations, plaintiffs contend:

> [I]t is very clear that plaintiffs who have personal injury claims ten years from now arising from this common course of conduct, there isn't a court in the country that's going to bar them from pursuing those personal injury claims because you choose to certify a(b)(2) class for purposes of providing clean water.

Tr. at 273.

Plaintiffs fail to cite, and this Court cannot find, any authority for the proposition that absent class members with personal injury or property claims can be adequately represented by class representatives seeking only injunctive relief.[24] While most courts would probably extend the general rule developed in civil rights cases to tort classes, several courts have nevertheless held that the waiver or abandonment of personal injury and other claims by named plaintiffs render them inad-

the unraised personal injury claims of those class members who decide not to opt out." *Millett v. Atlantic Richfield Co.*, No. 98 Civ. 555, 2000 WL 359979, at *9 (Me.Super.Mar. 2, 2000) (citing *Chmieleski v. City Prods. Corp.*, 71 F.R.D. 118, 148 n. 25 (W.D.Mo.1976)).

**24.** Plaintiffs cite *German v. Fed. Home Loan Mtge. Corp.*, 885 F.Supp. 537, 555 (S.D.N.Y. 1995), in which the court allowed a class of tenants to sue their building owners for injunctive relief and preserve their right to bring individual damages actions later. Because the court conducted only a minimal analysis regarding adequacy of representation, and did not consider the res judicata effect of the plaintiffs' decision to seek only injunctive relief on behalf of the class, I do not find this decision sufficiently persuasive.

equate as class representatives.[25] *See Thompson v. American Tobacco Co.*, 189 F.R.D. 544, 550–51 (D.Minn.1999) (ruling that the reservation of personal injury and damage claims rendered class representatives inadequate); *Feinstein*, 535 F.Supp. at 606 (holding that failure to bring available claims rendered named plaintiffs inadequate); *see also Millett*, 2000 WL 359979, at *9 (stating that named plaintiffs were inadequate representatives because, although their complaint contained general allegations about alleged health risks of MTBE, they disavowed personal injury claims); *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 679 N.Y.S.2d 593, 601–02 (1st Dep't 1998), *aff'd*, 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999) (holding that plaintiffs who disclaimed personal injury claims were inadequate class representatives). Because only subsequent courts will determine the res judicata effect of any judgment, *see* 7B *Fed. Prac. & Proc. Civ.2d* § 1789 & n. 16 (2002) (citing *Harrison v. Lewis*, 559 F.Supp. 943, 947 (D.D.C.1983)), these decisions indicate that this Court could not ensure that its order would preserve the rights of absent class members to bring personal injury or property damage claims, or of the named plaintiffs to bring subsequent damages actions.

As another possible solution to the res judicata problem, plaintiffs ask the Court to utilize Federal Rules of Civil Procedure 16 and 42 to "resolve speculative conflicts between class representatives and class members." Pl. Reply Mem. at 19–20 n. 25.[26] There is nothing speculative about the conflicts here, however. Plaintiffs have represented that exposure to MTBE at high levels causes a variety of health problems. *See* Pl.

Mem. at 20–23 (listing "eyes burn[ing]," "gastro-intestinal irritation and bloating of abdomen," "extreme dryness of the skin and vision problems," "health problems," "gall bladder problems," "seizure disorder," "failure of the thyroid," "asthma," "frequent rashes," and "anxiety as a result of the exposure"), and many of the declarants allege actual, non-speculative physical injuries resulting from MTBE contamination. *See supra* Part II.B.6.

There is also a serious concern as to whether the named plaintiffs' stake in the action is substantial enough, relative to class members who suffered personal injury, to prosecute this action vigorously on behalf of absent class members. The named plaintiffs actually claim no personal injury. In fact, they generally allege that their well water is contaminated at levels tens or hundreds of times below the relevant state standard for safe drinking or cleanup. Thus, the primary injury for the majority of the proposed class representatives is the bad-tasting and bad-smelling water from low-level MTBE contamination. Many, if not most, have received relief from administrative agencies in the form of alternate water hookup, bottled water or filtration systems. *See supra* Part II. When viewed against the risk that subsequent courts would preclude absent class members from bringing personal injury claims, the named plaintiffs' relatively weak incentive to prosecute this case leads to the inescapable conclusion that the class representatives are inadequate.

## B. RULE 23(b)—MAINTAINABILITY

Even if this Court were to find a way to cure the typicality and adequacy problems

---

**25.** Even if subsequent plaintiffs are not barred by a class judgment from bringing personal injury and property damage claims, determination of dispositive issues in a classwide trial would bind all class members. Thus, an individual who has suffered physical injury as a result of severe MTBE contamination, will be bound by an adverse jury determination that, *e.g.*, MTBE is not a defective product. Such determination will dispose of any subsequent personal injury suit. Because the Seventh Amendment prevents reexamination of issues decided by a jury, this Court may not preserve the right of absent class members to relitigate any issue. U.S. Const. amend. VII.

**26.** Rule 16 provides that a court "may take appropriate action, with respect to ... matters as may facilitate the just, speedy, and inexpensive disposition of this action." Fed.R.Civ.P. 16(c). Rule 42 provides that "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint ... trial of any or all the matters in issue in the actions...." Fed.R.Civ.P. 42(a). The court may also "order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, [etc.]." Fed. R.Civ.P. 42(b).

presented by the proposed class, plaintiffs cannot establish that the action is "maintainable" as defined by Rule 23(b). Fed.R.Civ.P. 23(b). Rule 23(b) provides that "an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition" one of three alternative definitions of maintainability is met. *Id.* (b)(1)-(3). Plaintiffs argue that this action meets the definition articulated in subsection (b)(2), as well as the definition in (b)(3).[27]

### 1. Subsection (b)(2)

■ Pursuant to Rule 23(b)(2), a class action is maintainable if "the party opposing the class has acted or refused to act on grounds *generally applicable* to the class, *thereby making appropriate final injunctive relief* or corresponding declaratory relief *with respect to the class as a whole.*" Fed. R.Civ.P. 23(b)(2) (emphasis added). Rule 23(b)(2) certification is appropriate "when a suit seeks to define the relationship between the defendant(s) and the world at large." *Daniels,* 198 F.R.D. at 413 (alterations in original) (quoting *Weiss v. York Hosp.,* 745 F.2d 786, 811 (3d Cir.1984)). "The (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury," *Robinson,* 267 F.3d at 162, and is "most commonly relied upon by litigants seeking institutional reform in the form of injunctive relief," *Daniels,* 198 F.R.D. at 414.

■ Rule 23(b)(2) was "designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons." *Baby Neal v. Casey,* 43 F.3d 48, 58 (3d Cir.1994). *See also Daniels,* 198 F.R.D. at 422 (certifying class of African-American and Latino men who were allegedly stopped and frisked by police street crimes

unit without reasonable suspicion); *Arnold v. United Artists Theatre Circuit,* 158 F.R.D. 439, 451–52 (N.D.Cal.1994) (certifying class of disabled theater-goers who sought movie theaters' compliance with the ADA). In addition to its frequent application to civil rights cases, some courts have extended this provision to, *inter alia,* classes alleging systemic failure of child welfare services, *see, e.g., Baby Neal,* 43 F.3d at 58–59; *LaShawn A. v. Dixon,* 762 F.Supp. 959, 960 (D.D.C. 1991), as well as suits alleging miscalculation of Social Security benefits, *see Forbush,* 994 F.2d at 1106; *Gilchrist v. Human Res. Admin.,* No. 87 Civ. 7820, 1989 U.S. Dist. LEXIS 7850, at *10 (S.D.N.Y. July 11, 1989) (Westlaw unavail.). Indeed, its drafters stated expressly that "[s]ubdivision (b)(2) is not limited to civil-rights cases." Fed.R.Civ.P. 23(b)(2) Advisory Committee's Note (1966).[28] The Committee elaborated:

> [A]n action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential. So also a patentee of a machine ... could be sued on a class basis by a numerous group of purchasers or licensees, or by a numerous group of competing sellers or licensors of the unpatented machine, to test the legality of the "tying" condition.

*Id.*

■ The examples provided by the Advisory Committee illustrate that Rule 23(b)(2) applies only where class treatment is "clearly called for,"[29] *i.e.* in situations where a court, through a single injunction or declaration,

---

**27.** In the final footnote of their Reply Memorandum, plaintiffs state that "[t]he Court could also certify the proposed class under FRCP 23(b)(1)(A), to prevent inconsistent rulings regarding defendants' required [sic] conduct." Pl. Reply Mem. at 23 n. 27. Because this contention has not been briefed and was not pressed at the Hearing, and because the proposed class does not satisfy Rule 23(a) in any event, I decline to consider certification under (b)(1).

**28.** This is the most recent Note on subdivision (b)(2).

**29.** The Committee introduces Rule 23(b)(3) as follows: "In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above [referring to (b)(2)], but it may nevertheless be convenient and desirable...." Fed. R. Civ. 23(b)(3) Advisory Committee's Note.

can redress "group, as opposed to individual, injuries...." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 (11th Cir.1983). A Rule 23(b)(2) action cannot resolve individualized issues of fact, nor provide different types of relief required to redress individual injuries. "A class action may not be certified under Rule 23(b)(2) if relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant." 5 *Moore's Fed. Prac.* § 23.43(2)(b) at 23–195 (3d ed.2000).

Where courts have granted Rule 23(b)(2) certification in the tort context, they have done so where a class seeks only medical monitoring and where a single actor or few actors have caused a discrete accident or contamination of an isolated geographic area. *See, e.g., Olden v. LaFarge Corp.*, 203 F.R.D. 254, 269 (E.D.Mich.2001); *Gibbs v. DuPont*, 876 F.Supp. 475, 480 (W.D.N.Y.1995); *see also infra* Part IV.B.1.c. (discussing manageability). In comparison, this case presents a novel issue: whether a hybrid environmental contamination/products liability class, seeking mandatory injunctive relief in the form of clean water and well remediation, may be certified pursuant to Rule 23(b)(2) where: the class members are geographically dispersed; a large group of actors manufactured the product in question but the contamination stems directly from such diverse causes as burst pipelines, car accidents and leaking USTs; and the level and effect of the contamination differ dramatically among the putative class members.

### a. Defendants' Alleged Conduct Is Generally Applicable to the Proposed Class

■ Plaintiffs argue that the proposed class action meets the first requirement of Rule 23(b)(2)—general applicability—because the defendants conspired to use MTBE in

their gasoline and promote its continued use, despite their knowledge of MTBE's dangerous properties. "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided that it is based on grounds which have general application to the class." Fed.R.Civ.P. 23(b)(2) Advisory Committee's Note. Plaintiffs must simply allege that "their injuries derive from a unitary course of conduct...." [30] *Marisol A.*, 126 F.3d at 377. Accepting plaintiffs' allegations as true for the purposes of this motion, defendants have allegedly acted on grounds applicable to the class by using MTBE in their gasoline.

### b. The Appropriateness of Injunctive Relief with Respect to the Class as a Whole

■ Rule 23(b)(2) next requires a court to examine the appropriateness of injunctive relief with respect to the class as a whole. "[I]njunctive relief embraces all forms of judicial orders, whether they be mandatory or prohibitory." *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 387 (D.Colo.1993) (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* § 1775 (1986)). Rule 23(b)(2) does not require that all plaintiffs be identically situated. *See Baby Neal*, 43 F.3d at 59. "What is important is that the relief sought by the named plaintiffs [ ] benefit the entire class." *Id.*

■ Here, although plaintiffs have alleged a common course of conduct, they have not shown that injunctive relief is thereby appropriate with respect to the class as a whole, as required by Rule 23(b)(2). *First,* individualized issues among the named plaintiffs and putative class members destroy Rule 23(b)(2)'s presumption of cohesiveness.

---

**30.** Defendants argue that they did not engage in "common conduct" because each marketed and used MTBE for a different period of time, and sometimes not at all, in the class states. *See* Defendants' Joint Response to Trial Plan ("Trial Plan Opp.") at 28. In addition, not every defendant belonged to the trade organizations that plaintiffs allege facilitated their conspiracy to use and promote MTBE. *See id.* at 29. Eight out of the twenty defendants, for example, were never members of the Oxygenated Fuels Association, and only a handful of the defendants participated in the MTBE Health Effects Testing Task Force. *See id.* at 29–30. Because I must generally credit plaintiffs' allegations, the first defense is not dispositive because a common course of conduct might have existed despite differing dates and markets, and the second defense, even if proven, would not defeat proof of conspiracy or common scheme or plan.

*Second*, such lack of cohesiveness precludes this Court from issuing an injunction that would comply with Rule 65(d)'s requirement of specificity. *Third*, no injunction that this Court could issue would bind third party polluters.

### i. Individualized Issues Rebut Presumption of Cohesiveness

 "The hallmark of the (b)(2) action is homogeneity." *Arnold*, 158 F.R.D. at 450. Class members in a(b)(2) action must share some "preexisting legal relationship or [a] significant common trait such as race or gender." *Holmes*, 706 F.2d at 1155. As the Seventh Circuit has observed:

> Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members.

*Lemon v. Int'l Union of Operating Engineers*, 216 F.3d 577, 580 (7th Cir.2000). *See also Robinson*, 267 F.3d at 165. Plaintiffs argue that the Court should accord them the benefit of this presumption because they are seeking only injunctive relief on behalf of the class.

 Yet, in deciding a Rule 23(b)(2) motion for class certification, a court must "ensure that individual issues do not pervade the entire action [because] the suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently." *Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir.1998) (citing *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (E.D.Pa.1976)). Indeed, "[t]he cohesiveness requirement is greater in a Rule 23(b)(2) class action [than in a 23(b)(3) action], because unnamed class members are bound by the action without the opportunity to opt out." *American Law of Products Liability 3d ("Am.L.Prod.Liab.3d")* § 51:55 (2002) (citing *Barnes*, 161 F.3d at 142). *See also Geraghty v. United States Parole Comm'n*, 719 F.2d 1199, 1205–06 (3d Cir. 1983) (noting that denial of 23(b)(2) certification was proper "in the presence of disparate factual circumstances"); *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 248–49 (3d Cir.1975) (emphasizing cohesiveness requirement for (b)(2) actions); *O'Connor v. Boeing Inc.*, 197 F.R.D. 404, 413 (C.D.Ca.2000) (decertifying (b)(2) medical monitoring class because "individual variances" caused the court to conclude that "maintaining a class action on longer provides for judicial economy or the fair determination of [the] controversy").

Here, defendants have successfully rebutted Rule 23(b)(2)'s presumption of homogeneity by demonstrating the existence of individualized issues.[31] First, the evidence indicates that the level at which people perceive the presence of MTBE in water varies significantly. EPA studies show that "[n]ot all individuals respond equally to taste and odor because of differences in individual sensitivity." 12/97 EPA Drinking Water Advisory: Consumer Acceptability Advice and Health Effects Analysis on Methyl Tertiary–Butyl Ether ("12/97 EPA Rpt."), Ex. 48 to Jt.App., at 25 (reporting a range in perception of 15 to 180 micrograms per liter or ppb for odor, and 24 to 135 ppb for taste). Indeed, one named plaintiff, O'Brien, testified that he could not taste MTBE in his water at a concentration of 83.9 ppb, which far exceeds New York's M.C.L. § of 10 ppb for drinking water. *See* 9/19/00 Deposition of O'Brien ("O'Brien Dep."), Ex. 18 to Jt.App., at 76. Yet, the proposed class would include all individuals whose wells contain "detectable" MTBE, which has been defined by current technology as .1 ppb.[32] *See supra* Part II.B.

---

31. Plaintiffs argue that "[t]he authorities cited by Defendants denied certification of (b)(2) classes only because of individualized issues pertaining to the question of liability...." 5/10/02 Plaintiffs' Reply in Support of Trial Plan ("Trial Plan Reply") at 12. But the same is true here. The following individual issues of fact, upon which liability depends, must be resolved as to each class member: (1) whether a UST owner or operator in her neighborhood was warned about leakage; (2) whether she received a warning about MTBE; and (3) whether she actually suffered an injury where MTBE is detected at a level below the relevant state MCL, and she cannot taste or smell it.

32. Defendants are entitled to offer proof on whether each individual has suffered an actual injury in cases where the level of contamination is far below the state safety standard.

There are also differences in the level of contamination that the named plaintiffs allege, the source of the contamination, how the contamination affects each plaintiff, and the nature of relief that each will require. For example, several named plaintiffs have MTBE in their wells at levels far below the state MCLs. *See id.* The Reynolds' well, on the other hand, contains MTBE at a level of 1500 ppb. *See id.* The alternate water system provided to Young meets her needs, but she seeks to have the use and enjoyment of her well restored. *See id.* In contrast, the Christensens drink bottled water because they feel that they cannot ever trust their water again, despite the fact that it tested negative for MTBE. *See id.*

If this Court were to grant plaintiffs' request and issue an order directing the defendants to provide "clean water" to the class, MC ¶ b.vi (Prayer for Relief), it could not do so without crafting a specific remedy for each class member. This is an impermissible result under Rule 23(b)(2). *See, e.g., Nguyen Da Yen v. Kissinger,* 70 F.R.D. 656, 666–67 (N.D.Cal.1976) (refusing to certify class of orphans whose biological families sought their return, where "two thousand individual injunctive orders or judgments of some kind would be necessary [which was] not a situation suitable for relief under Rule 23(b)(2)").

There are also many obstacles to a court order directing defendants to "provide remediation of contaminated wells." MC ¶ b.vii (Prayer for Relief). The wells of the named plaintiffs are located in varying proximity to immediate sources of pollution, such as the leaky, noncompliant tank owned by Big Trees Market. Each site requires investigation to characterize the source or sources of the gasoline, the first step in remediating groundwater. *See* Tr. at 116–18 (testimony of Bedient).[33] Some class members cannot even determine the source of the MTBE contamination due to the chemical's tendency to travel through air and water to remote destinations. Thus, in contrast to one-source spills or leaks where the specific plume is identified and remediated accordingly, the property of these class members would require even more far-ranging investigation to determine appropriate remediation. Further, it may be impossible to remediate some of the property, *see* MC ¶ 156, which would necessitate other forms of redress.

Plaintiffs argue that "there is a large body of case law where (b)(2) certification has been granted or upheld despite the individualized nature of the injunctive relief sought by the class." Pl. Trial Plan Reply at 12. Plaintiffs rely on *Marisol A.,* where the Second Circuit upheld the district court's (b)(2) certification of a class of children who alleged that failures in the city's child welfare system violated their First, Ninth and Fourteenth Amendment rights. 126 F.3d at 374, 378–79. The court rejected defendants' argument that "because the plaintiffs have alleged differing harms requiring individual remedies, no injunction will be appropriate for the entire class." *Id.* at 378. Instead, the court viewed the "central and systemic failures" of the child welfare system as amenable to uniform injunctive relief. *Id.* In contrast, the variances among class members here would render a single injunctive order ineffective. As the Circuit cautioned in *Marisol A.,* the district court's ruling was "near the boundary of the class action device." *Id.* at 377. By granting (b)(2) certification here, the Court would be "cross[ing] into forbidden territory."[34] *Id.*

---

**33.** Dr. Bedient testified that to remediate a well, one must first "characterize the source":

Q: [W]hat do you do to characterize the source?
A: Characterizing the source of contamination usually involves putting a monitoring well, taking soil samples, taking water samples.
Q: At the source?
A: At or near the source, yes.
. . .
Q: And you should try and find out how big the plume is in order to remediate it, so you know what went underground and how big it is?
A: Right.

. . .

Q: What else do you do to characterize the site?
A: Again, after you've done soil stratigraphy you've done groundwater flow, you've done plume size and shape, that's just—well, of course, you want to go in and also evaluate anything you can about the leak history . . . Tr. at 116–17.

**34.** The remaining cases plaintiffs cite do not support their theory of certification. *Walters v. Reno,* 145 F.3d 1032, 1037 (9th Cir.1998) (certifying a class of aliens challenging certain INS procedures as unconstitutional) and *Weigmann v.*

### ii. Lack of Specificity

Recognizing that this Court cannot certify a class that calls for an injunctive order tailored to each plaintiff's needs, plaintiffs argue that this Court need only fashion an order setting forth broad guidelines such as "provide notice," "test X times per year," "clean up water," "install filters," and "monitor filter X times per year." *See* Tr. at 267–68.

 Rule 65(d) describes the "form and scope" of permissible injunctive relief under the Federal Rules. Fed.R.Civ.P. 65(d). "Every order granting an injunction ... shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail ... the act or acts sought to be restrained." *Id. See also Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 51 (2d Cir. 1996) (vacating parts of injunctive order that were overbroad); *Perfect Fit Indus. v. Acme Quilting Co.,* 646 F.2d 800, 809 (2d Cir.1981) ("[V]ague or general injunctions cannot be easily obeyed or effectively and fairly enforced."); *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 292 (S.D.N.Y.2000) ("[B]asic fairness requires that those enjoined receive explicit notice of precisely what is outlawed.") (quoting *Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974)).

In defense of their proposal, plaintiffs argue that "[c]ourts routinely issue injunctive relief orders in cases involving seemingly complex matters ... without examining the specifics of each affected site or geographic area, and without stating exactly how the standards are to be met." Pl. Mem. at 34–35 (citing cases). But not one of the four cases they cite for this proposition is a class action. Further, three of the four cases involved only one disaster site. *See California v. Campbell,* 138 F.3d 772, 782 (9th Cir.1998); *Natu-*

*ral Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.,* 20 F.Supp.2d 700, 715 (D.Del. 1998); *Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F.Supp. 1368, 1397 (D.Haw.1993). The remaining case, *Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081, 1096 (W.D.Wa.1991), involved discrete spotted owl habitats.

Moreover, the injunctive relief sought by the plaintiffs in those cases amounted to enforcement of existing agency guidelines, and hence met Rule 65(d)'s specificity requirement. *See Campbell,* 138 F.3d at 782–83 (holding that an order to abate public nuisance was not overbroad under Rule 65(d) because it incorporated statutory guidelines by reference); *Texaco,* 20 F.Supp.2d at 701–02, 715 (ordering defendant to stop violating its National Pollution Discharge Elimination System ("NPDES") permit, and to determine the impact of its violations of the permit on the environment); *Thousand Friends,* 821 F.Supp. at 1397 (ordering defendant to allocate funds to a commission charged with assessing environmental damage caused by defendant's violation of its NPDES permit); *Evans,* 771 F.Supp. at 1096 (ordering defendants to comply with National Forest Management Act and enjoining defendants from selling logging rights in spotted owl habitats). Here, in contrast, plaintiffs' requested injunction for "the provision of clean water" and "remediation of contaminated wells" is too broad to satisfy Rule 65(d).[35] MC ¶¶ b.vi-vii.

### iii. Third Party Polluters Not Before the Court

Injunctive relief is also inappropriate in this case because not all of the polluters are before the Court. In many if not most cases, gasoline pollution of groundwater is caused by leakage from an improperly maintained UST. *See supra* note 5 (discussing UST

---

*Glorious Food,* 169 F.R.D. 280, 288 (S.D.N.Y. 1996) (certifying gender discrimination class), are prototypical (b)(2) actions seeking institutional reform, not individualized relief. *State Farm Mut. Auto. Ins. Co. v. Mabry,* 274 Ga. 498, 556 S.E.2d 114 (2001), is equally inapposite. There, a state court certified a class of insureds seeking recalculation of benefits under their automobile insurance policies. *See id.,* 556 S.E.2d at 120–24. To the extent that State Farm was required

to make individualized determinations as to the value of each insured's car, it was already required to make that calculation in order to perform its contract with each insured.

**35.** In addition, this Court lacks the benefit of statutory guidelines to order the provision of clean water, or remediation of wells contaminated with MTBE at levels below state MCLs.

problem and LUST programs). USTs are often owned by mom-and-pop businesses or other third parties. *See, e.g., supra* Part II.B (discussing Big Trees Market adjacent to the Christensen property, and Big Saver near the Costisicks); *see also* Tr. at 380 ("The vast majority of the tanks [USTs] are not owned by the defendants here. They are owned by the mom-and-pop people, many of whom own—bought the tanks and they are the ones who are the tanks owners today.") (argument by plaintiffs' counsel). Under plaintiffs' theory of the case, defendants are nevertheless liable for these parties' negligent behavior because releases of gasoline into the environment are foreseeable. *See* Pl. Mem. at 18; Pl. Reply Mem. at 7–9. Where a third party-owned UST is the source, however, the third party's cooperation—in allowing defendants to enter its property, in agreeing to upgrade tanks or in taking whatever steps are necessary to curtail future leaks—is essential to any remediation program.[36]

■ Any injunctive order issued by this Court would bind "only [ ] the parties to the action, their officers, agents, servants, employees, and attorneys, and [ ] those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.P. 65(d).[37] *See also Alemite Mfg. Corp. v. Staff,* 42 F.2d 832, 833 (2d Cir.1930) (Hand, J.) ("[N]o court can make a decree which will bind any one but a party; a court of equity is as much limited as a court of law; it cannot

lawfully enjoin the world at large, no matter how broadly it words its decree."); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc. Civ.2d* § 2956 (2002) ("A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction."). Thus, while an order from this Court to "clean up plaintiffs' property" would serve to bind the defendants, it would have no operative effect on, for example, Big Trees Market. *See supra* Part II.B.5.g. This presents a problem that a later contribution action cannot cure.[38]

### c. Lack of Efficiency and Manageability

■ Even if this Court were to ignore the inappropriateness of injunctive relief in this case, Rule 23(b)(2) certification cannot be granted here because a classwide trial of these claims would be inefficient and unmanageable. The Second Circuit "allow[s] (b)(2) certification if [the district court] finds in its informed, sound judicial discretion that ... class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy." *Robinson,* 267 F.3d at 164 (alterations and citation omitted). *See also Barnes,* 161 F.3d at 143; *O'Connor,* 197 F.R.D. at 413 (decertifying Rule 23(b)(2) class due to "the difficulty of applying [ ] individualized factors" and the lack of "judicial economy [and] fair[ness]"). *But see Forbush,* 994 F.2d at 1105 ("[Q]ues-

---

36. Contamination of groundwater must normally be addressed at its source. *See* Tr. at 116 (testimony of Bedient). In some cases involving minimal water contamination, it appeared from testimony at the Hearing that "well head remediation" might be sufficient. *Id.* In fact, this Court proposed ordering relief in the form of installing filters only, as opposed to remediation. *See id.* at 308–19. While plaintiffs appeared to agree with this idea, *see id.,* such relief would be narrow—at the expense of well owners whose high level contamination may require remediation at the source, *see, e.g., supra* Part II.B.5.b. (discussing Reynolds plaintiffs)—thus raising additional adequacy concerns, *see supra* Part IV.A.3. Furthermore, this idea would not solve the many other problems posed by class treatment of these claims, including unmanageability and inefficiency.

37. It appears that the only exception to this principle is that a third party may be bound by an injunction where it "knowingly aids, abets, assists, or acts in concert with a person who has been enjoined from violating the injunction." 11A *Fed. Prac. & Proc. Civ.2d* § 2956.

38. While joint tortfeasors are not indispensable parties and therefore need not be joined to determine liability, *see Temple v. Synthes Corp.,* 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990); *Samaha v. Presbyterian Hosp.,* 757 F.2d 529, 531 (2d Cir.1985), "[e]quitable remedies may not be passed on to other alleged wrongdoers in the manner that damages can be passed on to joint tortfeasors or indemnitors by way of contribution or indemnification," *Moreland v. Behl,* No. 92 Civ. 1238, 1995 WL 150579, at *4 (N.D.Cal. Mar.22, 1995).

tions of manageability and judicial economy are [ ] irrelevant to 23(b)(2) class actions.").[39]

Plaintiffs argue that many courts have certified (b)(2) classes in the mass tort context without discussion as to whether the litigation would be manageable. *See Olden*, 203 F.R.D. at 269 (certifying (b)(2) class of single family residence owners in city who sued cement plant for abatement of cement dust emissions); *Gibbs*, 876 F.Supp. at 480 (certifying (b)(2) medical monitoring class of all present and former employees of chemical company who were exposed to a toxic substance on the job by defendant employer and three other defendant-manufacturers of the chemical); *Cook*, 151 F.R.D. at 387–88 (certifying (b)(2) medical monitoring class of residents living near a former weapons production facility in northwest Denver, Colorado, in suit against two companies that allegedly released radioactive and non-radioactive substances into the surrounding area);[40] *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705, 711–

13 (D.Ariz.1993) (certifying (b)(2) medical monitoring class where defendant dumped toxic substances at one site); *Day v. NLO, Inc.*, 144 F.R.D. 330, 332 (S.D.Ohio 1992) (certifying medical monitoring class of employees of defendant operators of plan for negligent exposure to radioactive and other hazardous materials while on job), *vacated on other grounds*, 5 F.3d 154 (6th Cir.1993).[41] Each of these cases involved monitoring for future harm as opposed to treatment or remediation, one or few defendants who had released a substance into the environment, discrete incidents or one geographical area, where a single actor or few actors were involved. Here, in contrast, plaintiffs allege ongoing, non-site-specific contamination over a course of twenty to thirty years. Thus, individual issues regarding warnings given to intermediate vendees and UST owners and operators,[42] existence of injury, and the level and type of remediation required, must be tried. Moreover, the overwhelming majority

---

**39.** This pronouncement constitutes nonbinding dicta. The class members in *Forbush* were "all former and current [J.C.] Penney employees who have been employed any time after January 1, 1976." 994 F.2d at 1103. Thus they were easily ascertained and plaintiffs' class action for recalculation of Social Security benefits was easily managed.

**40.** This class was later decertified because the medical monitoring sought by the class was deemed to be a form of money damages. *See Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 478–80 (D.Colo.1998). Many courts have refused to certify (b)(2) classes on this basis. *See, e.g., Kaczmarek v. IBM Corp.*, 186 F.R.D. 307, 313 (S.D.N.Y.1999).

**41.** The state products liability cases that plaintiffs cite are also inapposite. *See* Order Granting Certification of Non–Opt Out Class Under 23(b)(2) in *Gross et al. v. Mobil AV 1*, No. 95 Civ. 1237 (N.D.Cal. Apr. 28, 1995), Ex. G to Reply Declaration of Morris Ratner ("Ratner Reply Decl."). *See also* Reply Declaration of Elizabeth J. Cabraser, Plaintiffs' Counsel ("Cabraser Reply Decl.") ¶¶ 4–10 (discussing *Naef et al. v. Masonite Corp.*, No. 94 Civ. 4033 (Ala. Cir. Ct. Mobile Co.), where the court certified a class of purchasers of defective residential hardboard siding); *id.* ¶¶ 11–12 (discussing certification of another class of "home siding" users in *Williams et al. v. Weyerhaeuser Co.*, No. 99 Civ. 5787 (Cal.Super. Ct. San Fran. Co.)); *id.* ¶¶ 13–15 (discussing certification of home owners who had used defendants' allegedly defective "roofing shakes" in *Richison v. American Cemwood Corp.*, No. 00 Civ.

5532 (Cal.Super. Ct. San Joaquin Co.)). In each of these cases, plaintiffs sought injunctive relief in the form of recall or repair of a household product manufactured by a single actor, or very few actors. Only *Gross* was tried—and in that case, the defendant had consented to class certification. *See* Tr. at 315–16. The remaining three cases are state court cases that settled after certification. Not one of the cases was reviewed by an appellate court.

The remaining case that plaintiffs rely upon, *German*, 885 F.Supp. 537, is distinguishable. There, a group of tenants sued eight successive owners of two apartment buildings seeking injunctive relief in the form of "safe abatement of lead on all painted surfaces." *Id.* at 552. The court established a subclass for each defendant building owner, recognizing that not all plaintiffs could recover from all the defendants. *See id.* Further, each subclass plaintiff had a preexisting legal relationship, *i.e.*, landlord-tenant, with a particular defendant.

**42.** Some of the defendants argue that they gave warnings regarding MTBE to downstream handlers, and to the public via government websites. *See* Def. Trial Plan Opp. at 25–26. "[I]n certain circumstances, a manufacturer may escape liability for failure to warn if adequate warnings are given to the immediate vendee of the product." *MTBE I*, 175 F.Supp.2d at 626 n. 49. Thus, defendants would be entitled to prove, per class member, that the circumstances were such that defendants' liability was negated by provision of an adequate warning to the immediate vendee in that plaintiff's neighborhood.

of state and federal courts have denied certification of environmental mass tort classes, even in single-source cases.[43]

The task inherent in ascertaining the class members also renders this case unmanageable.[44] Because plaintiffs must bear the cost of ascertaining the class, they propose that well owners pay for home tests. The taking of samples is complicated, and is therefore normally performed by trained technicians. *See supra* Part II.C.2. It is perhaps for this reason that plaintiffs' expert Anthony Brown admitted at the hearing that, in his professional experience, he had never relied on a well test where a homeowner had collected the sample. *See id.* Nor did the parties present evidence on the cost of hiring a technician to visit the property of each private well owner who responds to the notice. The fact that multiple tests must be performed for an accurate reading further complicates the process. *See* Tr. at 69 (testimony of Brown). It is inevitable that defendants will challenge the results of this process for each well owner. That a claims facility would be charged with resolving this problem, rather than this Court, does not lessen its magnitude.

In light of the difficulties inherent in ascertaining the class, it is clear that a defense verdict at trial would achieve very little, if any, judicial economy. A verdict in favor of defendants would, in theory, bind all members of the class—namely, private well owners with detectable MTBE in their wells—and thus serve the purposes of Rule 23. *See Simon v. Philip Morris, Inc.*, 200 F.R.D. 21, 47 (E.D.N.Y.2001) ("'[T]he class action mechanism [is] a device created to foster 'judicial economy and efficiency ....' '") (quoting *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 129 B.R. 710, 802 (E.D.N.Y.1991)). In reality, however, the verdict would only bind the few well owners whose names are on existing lists of owners of MTBE-contaminated wells.[45] *See supra* Part II.C. A jury finding of no liability would most likely have no effect on the remainder of the 2.5 million well owners. Such individuals, even if provided the opportunity, would likely not come forward to test their wells and establish membership in a class bound by an unfavorable verdict. If and when any one of these individuals sued the defendants in the future, there would be no way to establish that he or she was a member of the class.[46] Hence, he or she would not be bound and would be free to relitigate all of the issues determined in the class trial.[47] This one-sided res judicata

43. *See infra* Part IV.B.2. (discussing Rule 23(b)(3)).

44. In civil rights and other cases seeking institutional reform in the form of a prohibitory injunction ("Do not do this") or imperative ("Do this"), the class may remain amorphous and undefined. *See Baby Neal*, 43 F.3d at 58. In such cases, this Court has noted that the distinction between prohibitory and mandatory injunctions may be "illusory." *Daniels*, 198 F.R.D. at 422 (discussing the doctrine of *Galvan v. Levine*, 490 F.2d 1255 (2d Cir.1973)). In cases seeking a complex mandatory injunction or money damages, however, class members must be ascertained in order to claim relief.

45. Under plaintiffs' plan, notice of the class action would not be sent until after a verdict. *See supra* Part II.C. Following a victory for plaintiffs, such notice would inform private well owners that they could claim relief by testing their wells and claiming membership status based on the results. *See id.* It is unclear whether notice of the class action would even be sent if defendants prevailed.

At the hearing, the Court explored the suggestion that it provide mandatory non-opt out notice for a(b)(2) class. *See* Tr. at 369–72. Notice by publication to all well owners in the class states would allow them to come forward and test by a date certain, and then be bound. *See id.* at 369. This solution to the problem of ascertaining class members proved illusory, however. There remains no method for proving that a subsequent plaintiff who did not test was in the class of people "who had MTBE in their wells, whether they knew it or not" as of a date certain.

46. This is not true of other types of class actions. In the medical context, for example, where a would-be class member claims to have developed an illness after the cut-off date for class membership, a defendant can use medical records to prove otherwise. Unlike water testing, most people see a doctor regularly. In any other products liability suit, a manufacturer can seek to defend a later suit by showing that the product was discontinued after a certain date or by demanding proof of date of purchase.

47. Other environmental or tort decisions cited by plaintiffs do not suffer from this infirmity. In *Amerada Hess Corp. v. Garza*, 973 S.W.2d 667, 672 (Tex.App.1996), for example, the court certified a class of several thousand property owners who resided within a two mile radius of the

effect leads to the conclusion that class treatment of these claims would not be an efficient use of judicial resources.

## 2. Subsection (b)(3)

Plaintiffs argue that, should the Court find that the class does not satisfy Rule 23(b)(2), the proposed class meets the requirements of Rule 23(b)(3).

■ A class action may be maintained pursuant to Rule 23(b)(3) where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). In deciding whether a class is maintainable under Rule 23(b)(3), a court should consider, *inter alia,* "the interest of the members of the class in individually controlling the prosecution or defense of separate actions" and "the difficulties likely to be encountered in the management of a class action." *Id.* While a court may not decline to certify a class for the sole reason that it may become unmanageable, "the issue of manageability of a proposed class action is always a matter of justifiable and serious concern for the trial court and peculiarly within its discretion." *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d at 140–41.

■ Because Rule 23(b)(3) requires that common issues predominate, courts deny certification where individualized issues of fact abound. *See, e.g., In re LifeUSA Hldg., Inc.,* 242 F.3d 136, 144–46 (3d Cir.2001); *Neenan*

*v. Carnival Corp.,* 199 F.R.D. 372, 375 (S.D.Fla.2001). It is for this reason that the majority of courts refuse to certify mass tort actions brought pursuant to Rule 23(b)(3). *See, e.g., Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 626–27 (3d Cir.1996), *aff'd. sub nom., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 628, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (affirming decertification of asbestos personal injury class); *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1084–85 (6th Cir. 1996) (reversing certification of penile implant products liability class); *Boughton v. Cotter Corp.,* 65 F.3d 823, 827–28 (10th Cir. 1995) (affirming denial of class certification in environmental tort case); *see also In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 164–66 (2d Cir.1987) (sharply criticizing use of class action device in mass torts cases due to inherent problems of individualistic causation, resulting inefficiency, and adequacy);[48] Fed.R.Civ.P. 23(b)(3) Advisory Committee's Note (1966) (cautioning that mass accidents do not lend themselves to class certification).[49]

■ Plaintiffs argue that the defendants' decision to use MTBE, their shared knowledge of its dangers, the existence of alternatives to MTBE, and the foreseeability of gasoline releases, are all common issues that will predominate over individual issues. · In support of their argument, plaintiffs rely on several cases where courts certified environmental tort classes pursuant to Rule 23(b)(3). *See Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1196–97 (6th Cir.1988); *Cook,* 151 F.R.D. at 387–89 (relying on *Sterling* ). In each of these cases, however, the class representatives alleged a single accident, caused

defendant refineries, pipelines, petroleum storage facilities and chemical manufacturing plants. *See also* Declaration of Dennis C. Reich Re: Class ; Action Trial Plan/ Structure ("Reich Decl.") ¶¶ 2–4 (discussing *Garza* ). In *Hayden v. Atochem,* No. 92 Civ. 1054 (S.D.Tex.), the court certified a class of real property owners in Bryan, Texas, near a pesticide manufacturing plant. In both *Garza* and *Hayden,* it was possible to ascertain who would be barred from bringing a later suit if the defendants had prevailed.

**48.** *In re Agent Orange* affirmed a settlement class of servicemen and their relatives against manufacturers of a toxin used in the Vietnam War on the narrow ground that the military contractor

defense was central. 818 F.2d at 166. "Were this an action by civilians based on exposure to dioxin in the course of civilian affairs, we believe certification of a class action would have been error." *Id.*

**49.** The Committee stated in full:

A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages, but of liability and defense of liability, would be present, affecting the individuals in different ways.

Fed.R.Civ.P. 23(b)(3) Advisory Committee's Note.

by a single or few actors who released the chemical within a specific geographic location. *See Sterling*, 855 F.2d at 1196–97 (release of toxin at one landfill); *Cook*, 151 F.R.D. at 387–89 (one weapons production facility releasing toxic substances into surrounding area).[50]

Here, by contrast, plaintiffs allege no single incident. Rather, as noted earlier, they allege contamination over many years across four states indirectly caused by twenty defendants in conjunction with innumerable third parties who released the contaminant into the environment. Predominance cannot be found because a different intermediate or third party actor, such as a UST owner, has directly caused harm to each plaintiff by releasing gasoline in the vicinity.[51] *See Am. Med. Sys.*, 75 F.3d at 1085 (ruling that a finding of predominance was precluded where each plaintiff had received different instructions and assurances from treating physician). Further, the degree of MTBE contamination differs from property to property, and the nature and extent of mandatory relief necessarily will depend on site-specific examination. *See Church v. Gen. Elec. Co.*, 138 F.Supp.2d 169, 180–82 (D.Mass.2001) (denying certification of plaintiffs alleging nuisance and trespass arising from alleged contamination of PCBs due to property-specific issues). These issues in addition to others discussed above, *see supra* Part IV.B.1., preclude this Court from finding predominance here.

The second prong of the test set forth in Rule 23(b)(3) requires a showing that class treatment is superior to other methods of adjudicating claims of MTBE contamination. The "most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit." *Castano v. The Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir.1996). "Negative value claims are claims in which the costs of enforcement in an individual action would exceed the expected individual recovery." *In re Inter–Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 348 (N.D.Ohio 2001). Plaintiffs contend that this suit is a classic negative value case, yet also claim that "contamination by detectable levels of MTBE automatically results in a reduction of property value, for every class member." Pl. Trial Plan at 11. Thus, unlike a true negative value claim such as those seen in antitrust cases, these plaintiffs may employ tort lawyers, on a contingency basis, to bring individual actions. Indeed, several declarants—who are class members by definition—have already done so, and have achieved results by suing the oil companies and tank owners in their immediate neighborhoods. *See supra* Part II.B. Moreover, state agencies and funds have stepped in to clean up contaminated wells, and/or install filters and provide alternate water supplies to those class members whose water is contaminated at a level above the state MCL. Further, unlike in many situations where a class is certified, class treatment here will not deliver the traditional benefit of res judicata. *See supra* Part IV.B.1.c. Thus, use of the class device in this case is not superior to a combination of individual suits and state agency relief.

The remaining factors outlined in Rule 23(b)(3) also weigh against certifying this class. Class members whose wells are severely contaminated, or who have suffered personal injury, have a strong interest in controlling the prosecution of individual actions. In fact, several of the declarants have indicated a desire to retain control over their lawsuits, and have expressed concern that this class action would affect their ability to do so. *See, e.g.*, 1/21/02 Deposition of Mary Ann Konger, Ex. 35 to Jt.App., at 116; 2/4/02

---

**50.** The same is true for other environmental cases that have relied on *Sterling*. *See LeClercq v. The Lockformer Co.*, No. 00 Civ. 7164, 2001 WL 199840, at *1 (N.D.Ill. Feb.28, 2001) (metal fabrication plant releasing trichloroethylene into surrounding soil and groundwater); *Josephat v. St. Croix Alumina L.L.C.*, No. 99 Civ. 36, 2000 WL 1679502, at *1, *15 (D.V.I. Aug. 7, 2000) (aluminum plant emitting red bauxite dust and red mud by-products into nearby community);

*see supra* Part IV.B.1.b. (discussing cases where courts have certified (b)(2) classes alleging environmental harm).

**51.** Plaintiffs argue that the wells of other class members, the ambient well owners, have been polluted by the migration of MTBE from remote sources. This further aggravates the problems caused by the incohesiveness of this class.

Deposition of John Costisick, Ex. 28 to Jt. App., at 91–93. Finally, the inherent difficulties in ascertaining class membership has already led this Court to the conclusion that a class action here is unmanageable. *See supra* Parts II.C. (discussing testing), IV.B.1. (concluding that class treatment would be unmanageable and inefficient).

## V. DISCUSSION—ISSUE CERTIFICATION

In order to simplify matters, plaintiffs propose that the Court certify the class with respect to the following two issues only: (1) the appropriateness of injunctive relief; and (2) "defendants' liability" (general liability). Pl. Mem. at 38.

 Rule 23(c)(4) states, in pertinent part, that "[w]hen appropriate, [ ]an action may be brought or maintained as a class action with respect to particular issues ..." ("issue certification").[52] Fed.R.Civ.P. 23(c)(4)(A). District courts should take "full advantage of this provision ... to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies." *Robinson*, 267 F.3d at 167. *See also* Federal Judicial Center, *Manual for Complex Litig.3d* §§ 30.17 at 222 (1995); 1 Herbert B. Newberg, *Newberg on Class Actions* §§ 4.14–4.52 (3d ed.2000). However, issue certification is "not appropriate if, despite the presence of a common issue, certification would not make the case more manageable...." *Hamilton v. Accu–tek*, 935 F.Supp. 1307, 1331–32 (E.D.N.Y.1996) (Weinstein, J.) (denying certification of class of persons killed or injured by handguns). Plaintiffs have the burden of showing that issue certification will "materially advance a disposition of the litigation as a whole." *Robinson*, 267 F.3d at 167 n. 12

(quoting *In re Tetracycline Cases*, 107 F.R.D. 719, 727 (W.D.Mo.1985)) (quotation marks omitted).

 "The 'subclass' on each issue still must 'independently meet all of the requirements of subsection 23(a) and at least one of the categories specified in subsection (b).' "[53] *Central Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir.1993) (citation, alterations omitted); *Hamilton*, 935 F.Supp. at 1331 (rejecting plaintiffs' proposal to certify issues because "[t]hey have not demonstrated that all of the prerequisites have been met to permit class certification...."). Here, plaintiffs cannot show that the other requirements of Rule 23 have been met for either issue they seek to certify.

The first issue plaintiffs seek to certify, the "appropriateness of injunctive relief," *is* one of the requirements of Rule 23. *See* Fed.R.Civ.P. 23(b)(2) ("An action may be maintained as a class action [under Rule 23(b)(2) where] the party opposing the class has acted or refused to act on grounds generally applicable to the class, *thereby making appropriate final injunctive relief...*") (emphasis added). Because this is an integral part of the Rule 23(b)(2) test, it has already been addressed. *See supra* Part IV.B.1.b. (holding that due to the lack of cohesiveness of this case, the plaintiffs do not allege common conduct such that injunctive relief is appropriate). Further, plaintiffs do not show that a subclass certified with respect to this issue would meet any of the other Rule 23(b) maintainability requirements.

 Nor can the second issue plaintiffs propose for Rule 23(c)(4) treatment—general liability—be certified. Plaintiffs' suggestion regarding issue certification is similar to one

---

**52.** Rule 23(c)(4) also provides that "a class may be divided into subclasses and each subclass treated as a class...." Fed.R.Civ.P. 23(c)(4)(B). Beyond suggesting that the class be divided into subclasses by state, plaintiffs do not recommend any other division into subclasses. Subdivision by state would not solve any of the problems inherent in this proposed class.

**53.** *Robinson* does not call into question, as plaintiffs suggest, whether the other Rule 23 requirements must be met in order to certify a class with respect to an issue or issues. Rather, *Robinson* simply suggested in a footnote that certifi-

cation under Rule (c)(4) may not require that Rule 23(b)(3)'s predominance requirement be met. *Robinson*, 267 F.3d at 167 n. 12. This is not surprising because common issues will always "predominate" where the court certifies one or several common issues, but *Robinson* also cautioned that "we do not decide th[e] question [whether] '[t]he proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3)'...." *Id.* (quoting *Castano*, 84 F.3d at 745 n. 21).

rejected by the Seventh Circuit in a products liability case where the district judge, in certifying the class, "[apparently] did not envisage the entry of a final judgment but rather the rendition by a jury of a special verdict that would answer a number of questions bearing, perhaps decisively, on whether the defendants are negligent under [the various theories]...." *Matter of Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1297 (7th Cir.1995) (Posner, J.). There, as here, plaintiffs presumed that:

> [i]f the special verdict [were to] f[i]nd negligence, individual members of the class would then file individual tort suits in state and federal district courts around the nation and would use the special verdict, in conjunction with the doctrine of collateral estoppel, to block relitigation of the issue of negligence.

*Id.* That plan, the Seventh Circuit held, "so exceed[ed] the permissible bounds of discretion in the management of federal litigation as to compel [the appellate court] to intervene and order decertification." *Id.* Several reasons given by that court apply here.

*First*, plaintiffs propose that litigation be divided between generic and specific liability in a way that violates the Seventh Amendment's prohibition on reexamination of a jury verdict. *See* U.S. Const. amend. VII. While a court may instruct a jury to try only certain issues, *see Simon*, 200 F.R.D. at 32–35 (defending liberal use of Rule 23(c)(4) to aid judicial efficiency), it is constitutionally limited by concerns over juror confusion and uncertainty, *see id.* at 36–39 (discussing *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)). Here, juries in follow-on suits would be charged with the impermissible task of sorting out the following issues: (1) whether defendants were liable to a particular individual given the first jury's finding of general liability; (2) whether a particular release of gasoline was foreseeable in light of the first jury's determination of general foreseeability; and (3) whether a particular UST owner

received a warning in light of a jury finding that no warnings were given in general. *See Rhone–Poulenc*, 51 F.3d at 1303–04 (explaining juror confusion that would result from attempting to decide comparative negligence and proximate causation in follow-on trials where "negligence" had already been determined);[54] *accord In re Fibreboard Corp.*, 893 F.2d 706, 712 (5th Cir.1990) (rejecting proposal that "general causation" issue be tried because "[c]ommonality among class members on issues of causation and damages can be achieved only by lifting the description of the claims to a level of generality that tears them from their substantively required moorings to actual causation and discrete injury."); *In re Agent Orange*, 818 F.2d at 164–65 (stating that "generic causation" is not a proper issue that may be tried in a class action); *Hamilton*, 935 F.Supp. at 1331–32 (denying certification of class with respect to issues of "duty and breach only").

*Second*, to the extent that a trial on general liability *would* be effective in imposing liability, this Court shares the "concern with forcing the[ ] defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability." *Rhone–Poulenc*, 51 F.3d at 1299. Moreover, the odds in a classwide trial on general liability would be stacked against defendants: "[A] class trial on liability without any reference to[, for example,] the limitations defense runs the real risk of a composite case being much stronger than any plaintiff's individual action would be...." *O'Connor*, 197 F.R.D. at 415 (decertifying class where plaintiffs' plan called for trial on "overall liability" only) (alterations omitted).

*Third*, and finally, plaintiffs do not show that issue certification will materially advance this litigation. *See Hamilton*, 935 F.Supp. at 1331 (stating that Rule 23(c)(4) requires a showing that its use will "make the case more manageable or serve the varied interests Rule 23 seeks to advance," such

---

**54.** It is well-settled that bifurcation of trial is authorized in federal court, but such division must "carve at the joint" between liability and damages. *Rhone–Poulenc*, 51 F.3d at 1302. Where courts have severed the issue of general liability in a class setting, it was only where a complete determination as to liability could actually be made at a classwide trial due to the lack of third party actors. *See, e.g., Sterling*, 855 F.2d at 1196–97.

as "judicial economy and efficiency"); *Tetra-cycline*, 107 F.R.D. at 727. Following the determination of general liability, plaintiffs would necessarily bring individual actions to determine if they were actually entitled to relief in light of: (1) the applicable statute of limitations; (2) warnings received by a given class member or an intermediate actor in the class member's neighborhood; and (3) whether a class member actually perceived the presence of MTBE where contamination was below the state MCL. Thus, countless individual trials, in addition to defendants' contribution actions against third party UST owners and operators, would follow the class-wide trial. Plaintiffs' request for issue certification must therefore be denied.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is denied. A conference in these cases is scheduled for August 7, 2002 at 4:30 p.m.

SO ORDERED.